896 F.Supp. 434 (1995)
In re VALUEVISION INTERNATIONAL INC. SECURITIES LITIGATION.
Civ. A. No. 94-2838.
United States District Court, E.D. Pennsylvania.
August 11, 1995.
*435 *436 *437 Mark S. Goldman, Jeffrey L. Kodroff, Spector & Roseman, P.C., Philadelphia, PA, for Steven A. Kalodner.
Christopher K. Walters, Reed, Smith, Shaw & McClay, Philadelphia, PA, for ValueVision International, Inc.
Christopher K. Walters, Kenneth M. Kolaski, Reed Smith Shaw & McClay, Philadelphia, PA, Russell Hayman, Hugh Steven Wilson, Latham and Watkins, Los Angeles, CA, J. Patrick McDavitt, Briggs and Morgan, Minneapolis, MN, for Robert L. Johander.

OPINION
LOUIS H. POLLAK, District Judge.
This consolidated litigation arises out of a tender offer made in the spring of 1994 by ValueVision International, Inc. ("ValueVision") to purchase National Media Corporation ("National Media"). The plaintiffs, individuals *438 who claim to have bought or tendered shares of National Media stock between January 13 and April 21, 1994, purport to represent two classes: those who bought National Media stock in this period (the "Purchaser Class") and those who tendered their National Media stock pursuant to the tender offer (the "Tenderer Class").[1] The plaintiffs allege that ValueVision and its officers misled the investing public as to the likelihood that ValueVision would obtain the financing necessary to complete the merger. The plaintiffs claim that throughout the period of ValueVision's courtship of National Media, ValueVision made statements that gave the impression that financing was likely to be obtained when in fact it was ValueVision's undisclosed intention to finance the deal exclusively through a placement of high-yield, interest-sensitive debt securities  junk bonds  a form of financing that ValueVision considered unfeasible in an environment of rising interest rates. Plaintiffs allege that the price of National Media stock was inflated as a result of investors' false impression that ValueVision was likely to obtain financing and thus that the deal between ValueVision and National Media would be completed. Plaintiffs further allege that they relied on ValueVision's misrepresentations in purchasing and tendering National Media stock and that this reliance caused them injury because of the market's allegedly incorrect assessment of the value of National Media stock.
Based on these allegations, plaintiffs have filed a three-count complaint against ValueVision and individual officers of ValueVision. The first count asserts a claim by the Purchaser Class against ValueVision, Robert L. Johander, ValueVision's chief executive officer and chairman of the board, and Mark A. Payne, ValueVision's chief financial officer, under section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Securities and Exchange Commission rule 10b-5, 17 C.F.R. § 240.10b-5. The second count asserts a claim by the Tenderer Class against ValueVision, Johander, and Payne under section 14(e) of the Exchange Act. The third count asserts a claim under section 20 of the Exchange Act by both classes against all the individual defendants  Johander and Payne, as well as Nicholas M. Jaksich, president and chief operating officer of ValueVision, and Allen G. Aaranson, vice-chairman of the board of directors of ValueVision.
ValueVision has moved to dismiss the complaint under F.R.C.P. 12(b)(6) for failure to state a claim. In considering a 12(b)(6) motion, this court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir.1989). Such a motion should be granted only if plaintiffs have alleged no set of facts under which they could state a claim. I conclude that the 12(b)(6) motion should be denied with respect to Count I, granted with respect to Count II, and granted in part with respect to Count III.

I. Facts as Alleged in the Amended Complaint
ValueVision is a corporation engaged in the business of television home shopping sales. ValueVision markets consumer products through live television broadcasts on home shopping channels. Toward the end of 1993, ValueVision became interested in purchasing National Media, a corporation that markets "infomercials," thirty-minute blocks of television advertising that typically air between midnight and 9:00 a.m. As the infomercial industry had grown, so had National Media's revenues  in 1993, National Media reported net revenues of $142 million, up 38.9% from its 1992 earnings.
On January 13, 1994, ValueVision announced a proposal to acquire a majority of National Media's stock at $10 per share. In a letter to National Media, ValueVision's CEO Johander stated, "We believe that combining our companies would create a leader in the interactive video shopping marketplace of the future." At the time of this announcement, *439 and throughout the period of ValueVision's courtship of National Media, it was ValueVision's undisclosed intention to finance the deal exclusively through the issuance of junk bonds  high-yield, interest-sensitive debt securities. In the letter to National Media, Johander nonetheless stated that financing would not impede ValueVision's ability to complete the transaction: "ValueVision currently has over $50 million in cash on hand and a debt-free balance sheet. Therefore, we are confident that the financing required to effect the combination of our two companies could be arranged on a prompt basis." In this letter, Johander proposed to enter into negotiations with National Media to "conclude a definitive merger agreement."
The announcement of ValueVision's proposal brought on a rise in the price of National Media stock. Prior to the announcement, National Media's stock had been trading in the range of $6 to $7. The day before ValueVision's announcement, National Media stock closed at $7.75. The day after ValueVision's announcement, National Media's stock rose to a high of $8.25 per share.
ValueVision commenced a formal tender offer on February 7, 1994. Under this offer, ValueVision sought a majority of National Media stock, for which it would pay $10.50 per share. ValueVision filed with the SEC schedules 14D-1 and 13D, which stated that "based upon its total assets, shareholders' equity and minimum debt," it would "be able to raise the necessary funds" to complete the offer. ValueVision further stated that it had retained Salomon Brothers, Inc. "as its financial advisor and to assist it in raising such funds through the public or private issuance of debt or equity securities."
National Media and ValueVision signed a merger agreement on March 6, 1994. Under this agreement, ValueVision amended its tender offer to $11.50 per share. The merger agreement included a best-efforts clause, under which National Media and ValueVision agreed to use their "reasonable best efforts to take or cause to be taken all actions and to do or cause to be done all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement." The merger agreement also included a financing condition, under which ValueVision was not required to proceed with the offer if it could not obtain sufficient financing to purchase the number of shares necessary to gain a majority. If the financing condition was not satisfied by April 24, 1994  or if the time for obtaining financing was not extended to June 6, 1994  either National Media or ValueVision was entitled to terminate the merger agreement. The agreement provided that if either party terminated the agreement due to the financing condition, ValueVision was required to pay National Media a $7 million "break-up fee."
ValueVision issued a press release on March 7, 1994, announcing the merger agreement. In this press release, ValueVision proposed to obtain the necessary financing through "a private placement of straight debt securities."
During the week of April 15, 1994, Johander explained to National Media's Chairman, John J. Turchi, that unfavorable market conditions had increased the projected cost of financing and proposed a 90-day extension of the financing condition. During March and April 1994, interest rates had risen sharply, causing a correspondingly sharp increase in the projected costs to ValueVision of financing through interest-sensitive debt securities. Although alternative means of financing the deal were available  at perhaps an even greater cost to ValueVision  ValueVision never considered obtaining such financing. On April 15, 1994, ValueVision announced that it had postponed the private placement of high-yield, interest-sensitive debt securities, explaining that "market conditions" had led to "increased high-yield bond interest rates." ValueVision further stated that it was "exploring alternative financing for the acquisition."
Following this announcement, the price of National Media stock dropped to $7.00. Two days earlier, National Media stock had closed at $9.625 a share.
On April 21, 1994, ValueVision announced that it was terminating its tender offer for National Media. ValueVision's stated reason for the termination was that National Media had failed to satisfy the terms of the merger *440 agreement. ValueVision stated that there were inaccuracies in National Media's representations and warranties in the merger agreement, and that there had also been "adverse regulatory developments" regarding National Media. In explaining its reasons for the termination, ValueVision made no mention of any difficulties in obtaining financing.
The following day, National Media stock closed at $5.25 a share.
On April 25, 1994, National Media stated that it terminated the merger agreement and demanded that ValueVision pay the $7 million break-up fee. ValueVision has since refused to make this payment; in a separate proceeding, National Media now seeks the $7 million.

II. Count I  Violation of Section 10(b) of the 1934 Exchange Act and SEC Rule 10b-5
Section 10(b) of the 1934 Securities Exchange Act provides a broad prohibition on the use of "manipulative or deceptive devices" in connection with the purchase or sale of a security.[2] Pursuant to its authority under section 10(b), the Securities and Exchange Commission issued rule 10b-5, which prohibits material misrepresentations and omissions in connection with the purchase or sale of a security.[3] Rule 10b-5 has been interpreted to establish an implied private cause of action to purchasers or sellers of securities. See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).
To state a claim under rule 10b-5, a plaintiff must allege "that the defendant (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." Kline v. First Western Government Securities, Inc., 24 F.3d 480, 487 (3d Cir. 1994). The defendants challenge the sufficiency of the complaint with regard to materiality, scienter, and causation. I will examine each of these elements in turn.

A. Misstatements or Omissions of Material Facts
Defendants argue that they made no actionable misstatements or omissions of material facts because (1) the statements and omissions plaintiffs allege were not misleading as a matter of law, (2) any possible way that investors were misled is immaterial, and (3) the statements and omissions plaintiffs allege are not sufficiently factual to support liability. I find these arguments unpersuasive.

1. Whether the Alleged Statements and Omissions Could Be Construed as Misleading
Plaintiffs assert that the following alleged statements by the defendants created the impression among investors that there was a strong likelihood that ValueVision would obtain the financing necessary to complete its merger with National Media:
*441 1. On January 13, ValueVision's chairman Johander wrote to National Media that "we are confident that the financing required to effect the combination of our two companies could be arranged on a prompt basis."
2. On February 7, ValueVision issued a statement that "based upon its total assets, shareholders' equity and minimum debt," ValueVision would "be able to raise the necessary funds" to complete the deal.
3. Under the March 6 merger agreement, ValueVision stated that it had "retained Salomon Brothers, Inc. to assist in placing the Company's debt or equity instruments, the proceeds of which will be sufficient together with other funds on hand" to consummate the offer.
4. The merger agreement further provided that ValueVision agreed to use its reasonable best efforts to take all necessary steps to consummate the deal, including obtaining necessary financing.
The plaintiffs assert that these statements created a false impression due to the defendants' alleged failure to disclose that the only method of financing ValueVision considered was an offering of high-yield, interest-sensitive debt securities and that defendants were only willing to employ such a financing method in an environment of stable interest rates. The defendants contend that these statements could not have created a false impression of ValueVision's willingness to obtain financing. Defendants argue that the first two statements suggest nothing more than what the plaintiffs acknowledge to have been true  that ValueVision could have obtained financing at any time. The defendants similarly contend that the third statement also merely reflects the truth, that ValueVision had retained Salomon Brothers to assist in the financing.
A reasonable investor, however, may have understood these statements as an expression of ValueVision's willingness to accept the available financing, and thus as an indication of the likelihood that ValueVision would obtain financing. See McMahan & Co. v. Wherehouse Entertainment, Inc., 900 F.2d 576, 579 (2d Cir.1990) ("Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors."). In the context of ValueVision's merger offer, the statement that ValueVision was confident it could obtain financing might well have suggested that ValueVision was confident that financing would be available on reasonable terms and that ValueVision would accept these terms. Moreover, ValueVision made it known that it had retained Salomon Brothers for the very purpose of making financing arrangements, further indicating the strength of ValueVision's willingness to obtain financing. The suggestion that ValueVision was strongly willing to accept available financing is bolstered by the fourth statement, the obligation ValueVision incurred in the merger agreement to use its best efforts to obtain financing. The defendants contend that plaintiffs should not be allowed to rely on this statement because the plaintiffs were not a party to the merger agreement, and the agreement explicitly states that it confers no rights on any third parties. Plaintiffs, however, do not bring a breach-of-contract claim based on the "best efforts" clause. Rather, they assert that they were materially misled by a variety of statements, including the defendants' public acceptance of an obligation to use their best efforts to obtain financing. Read together, the statements to which plaintiffs point can be read to suggest a strong willingness to conclude financing arrangements without imposing any limitations on the type of financing.

a. The Applicability of the "Bespeaks Caution" Doctrine
Defendants argue that even if the statements discussed above can be read as misleading in isolation, ValueVision issued other cautionary statements that fully disclosed the risk that the deal would fall through for lack of satisfactory financing. Defendants point to three statements to support this argument. First, defendants point to a statement emblazoned in enlarged, bold, and capitalized lettering, on the first page of the offer to purchase, that stated: "THE OFFER IS CONDITIONED UPON ... THE PURCHASER HAVING OBTAINED SUFFICIENT FINANCING TO ENABLE IT TO CONSUMMATE THE OFFER AND TO PAY THE RELATED FEES AND TO *442 CONSUMMATE THE OFFER AND TO PAY THE RELATED FEES AND EXPENSES." Defendants' Ex. 1, at 1.[4] This statement also appears in the offer's financing condition. Id., at 8. Defendants point to a second statement in the offer, a statement that the determination of whether the financing condition was satisfied was "in the sole judgment of the Purchaser," i.e., the sole judgment of ValueVision. Id. Third, defendants point out that the offer provides that ValueVision "reserve[d] the right, in its sole discretion, ... to ... amend the Offer," including by "termination." Id.
Defendants assert that these three statements "bespoke caution," so as to negate the materiality of any alleged misrepresentation or omission regarding the likelihood that ValueVision would obtain financing. As the Third Circuit has stated, the "bespeaks caution" doctrine captures the common-sense notion that statements or omissions which in isolation could be seen as misleading should be considered in the context of accompanying cautionary statements. See In re Donald J. Trump Casino Securities Litigation, 7 F.3d 357, 364 (3d Cir.1993) ("As we see it, `bespeaks caution' is essentially shorthand for the considered in context, so that accompanying statements may render it immaterial as a matter of law."). Thus, the court stated:
[W]hen an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the "total mix" of information the document provided investors.
Id. at 371.
In order to conclude that cautionary statements render the misrepresentations and omissions immaterial, a defendant must prove that the cautionary statements "discredit the other one so obviously that the risk of real deception drops to nil." Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1097, 111 S.Ct. 2749, 2760, 115 L.Ed.2d 929 (1991). On a motion to dismiss under rule 12(b)(6), the defendants must show that under no set of facts will the plaintiffs be able to establish that the alleged misrepresentations and omissions were material. See Trump, 7 F.3d at 369 n. 13 ("Although materiality is a mixed question of law and fact which the trier of fact ordinarily decides, `if the alleged misrepresentation or omissions are so obviously unimportant that reasonable minds cannot differ on the question of materiality [it is] appropriate for the district court to rule that the allegations are inactionable as a matter of law.'") (quoting Shapiro v. UJB Fin. Corp., 964 F.2d 272, 280 & n. 11 (3d Cir.1992)) Cf. Mendell v. Greenberg, 927 F.2d 667, 673 (2d Cir.), amended on other grounds, 938 F.2d 1528 (2d Cir.1990) ("Because materiality is a mixed question of law and fact, it is a question especially well suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue.").
I cannot conclude as a matter of law that the defendants have met this burden. The purportedly cautionary statements make clear that the deal was contingent on the availability of acceptable financing. Moreover, investors probably understood that finding acceptable financing terms was, in turn, contingent on interest rates remaining within some acceptable range, and that ValueVision was under no obligation to accept financing on unreasonable terms. However, if ValueVision intended to pursue only junk bond financing, and if reasonable investors did not anticipate this intention, and if this intention substantially narrowed the range of acceptable interests rates, investors could have been misled as to the likelihood that ValueVision would find financing on terms it would accept. ValueVision's purportedly *443 cautionary statements do not conclusively correct this mistaken impression. Investors may have understood ValueVision's statements of confidence as an indication that financing would not present a significant obstacle to the consummation of the deal, when in fact the likelihood that ValueVision would accept financing terms could have been extremely sensitive to a rise in interest rates. In order for plaintiffs to establish liability under this theory, they will have to establish, inter alia, (1) how reasonable investors would have expected a rise in interest rates to affect financing for the deal, (2) that ValueVision had an undisclosed plan to pursue only junk bond financing, and (3) that this plan materially narrowed the range of interest rates at which the deal could be consummated. Because it is conceivable that plaintiffs will be able to make this showing, their claim cannot be dismissed on a 12(b)(6) motion.

b. Whether the Defendants' Subsequent Statements Corrected the Alleged Misstatements and Omissions
Defendants assert that the statements they issued on March 7, 1994 and April 15, 1994 corrected any possible earlier misrepresentation they may have made. On March 7, defendants issued a statement that they intended to pursue financing through "a private placement of straight debt securities." On April 15, defendants disclosed that it was postponing the placement of these securities due to increased financing costs. Defendants argue that any reasonable investor would have understood these statements as a disclosure that the type of financing ValueVision was considering was high-yield, interest-sensitive debt securities. To the extent that the plaintiffs' allegation is that ValueVision failed to disclose that this type of financing was the intended means of financing, defendants argue that this intention was adequately disclosed, at least by March 7.
Defendants may be correct in this argument. It is possible that reasonable investors understand the term "straight financing". On the other hand, plaintiffs argue that a reasonable investor would not have so understood these statements and that "[t]he term `straight debt' is meaningless." Plaintiffs' Opposition to Defendants' Motion to Dismiss, at 35 n. 13. I cannot resolve this factual dispute on a motion to dismiss.

2. Whether the Alleged Statements and Omissions Could Be Material
The defendants argue that even if the statements and omissions at issue were potentially misleading, they were not materially misleading. I conclude, however, that the plaintiffs have sufficiently pled facts from which materiality can be inferred.
A statement or omission is considered material if there is a substantial likelihood that a reasonable investor would view it as "having significantly altered the `total mix' of information made available." Basic v. Levinson, 485 U.S. 224, 232, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). The type of information at issue in this case has been characterized as "soft information." As the Third Circuit has stated, "The term soft information refers to statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, such as projections, estimates, and forecasts." In re Craftmatic Securities Litigation, 890 F.2d 628, 642 (3d Cir.1990). In Basic, Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Supreme Court held that an omission to disclose soft information could form the basis of section 10(b) and rule 10b-5 liability. In Basic, shareholders challenged as a material misrepresentation a corporation's denial that it was engaged in preliminary merger discussions. The Court rejected the argument that contingent information  e.g., the possibility of a merger  need not be disclosed until the contingency had come to pass. Rather, the materiality of contingent information involved weighing the probability that the event will occur and the anticipated magnitude of the event. Id. at 238-39, 108 S.Ct. at 986-87.
The soft information at issue in this case can be characterized as contingent information regarding the likelihood that ValueVision would find financing on acceptable terms *444 and that ValueVision would accept these terms. Applying the test adopted in Basic, I conclude that the alleged misrepresentations and omissions, by which investors were assertedly misled into believing that financing was likely to be obtained, could prove to be material. A reasonable investor who believed that ValueVision was likely to obtain the financing necessary to merge with National Media  when in fact ValueVision was not likely to obtain financing at a rate it would accept  may well have overvalued National Media. Because the deal could have appeared more likely to be completed than it actually was, National Media may have appeared to be a more appealing investment than a fully informed investor would have considered it. Thus, information that affects investors' expectations about the terms at which ValueVision would accept financing sufficiently meets the materiality requirement to survive a 12(b)(6) motion.
The misrepresented or omitted information can also be characterized as information regarding the defendants' intentions. The plaintiffs allege that the defendants misinformed the investing public into believing that they intended to obtain the necessary financing when in fact defendants' true intention was only to obtain a particular type of financing, and only if that type was commercially feasible. As the Third Circuit has concluded, a statement of intent can be material if it was untrue when made. In re Phillips Petroleum Securities Litigation, 881 F.2d 1236, 1245 (3d Cir.1989) ("An express statement of intent must be correct when made and an implied intent must be true when it is implied.") (quoting 5A A. Jacobs, Litigation and Practice Under Rule 10b-5, § 61.01[c][iii] at 3-68). Thus, if the plaintiffs can establish that the alleged statements of intention did not accurately convey ValueVision's true intent when made, they can establish materiality.

3. Whether the Alleged Misrepresentations and Omissions Constitute Facts
As discussed above, statements of opinion or intentions can be material under section 10(b) and rule 10b-5. However, to be actionable, such statements must also be statements of material facts. Until recently it was unclear when statements involving soft information  statements of reasons, beliefs, opinions, or intentions  could constitute statements of fact. In Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), the Supreme Court held that a proxy solicitation which described a merger offer as presenting a "high" value and a "fair" price was sufficiently factual as to fall within section 14(a) of the Exchange Act, which, like rule 10b-5, prohibits material misstatements or omissions of fact. The Court stated that in a commercial context, such statements "are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." Id. at 1093, 111 S.Ct. at 2758.
In Virginia Bankshares, the Court explained that a statement of opinion can be false in distinct two ways  because it suggests something false about the subject matter of the opinion and because the speaker does not actually hold the opinion asserted. For example, in Virginia Bankshares, proxy solicitation materials provided that the price offered was "fair" and "high." This statement could be false because, given the state of the corporation and the mood of the market, the price was not fair and high. The statement could also be false because the corporate officers who issued the statement did not believe that the price was high or fair, even if objectively the price was high and fair. The former can be termed objective falseness, while the latter can be termed subjective falseness. In Virginia Bankshares, the Court concluded that subjective falseness alone cannot provide a basis for liability. Id. at 1096, 111 S.Ct. at 2760 ("We therefore hold disbelief or undisclosed motivation, standing alone, insufficient to satisfy the element of fact that must be established under § 14(a)."). The Court perceived that allowing liability for subjective falseness alone would "authorize § 14(a) litigation confined solely to what one skeptical court spoke of as the `impurities' of a director's `unclean heart.'" Id. (quoting Stedman v. Storer, 308 F.Supp. 881, 887 (S.D.N.Y.1969)). Great problems of proof would arise, the Court recognized, if litigation focused exclusively on *445 the psychological state of the defendants in expressing an opinion. Authorizing such litigation could invite "strike suits" and "attrition by discovery." 501 U.S. at 1096, 111 S.Ct. at 2760. In contrast, suits based on objective falseness are more readily capable of proof by "garden-variety evidence." Id. at 1094, 111 S.Ct. at 2759.
The defendants argue that the plaintiffs have alleged no misrepresentations or omissions of material fact because the plaintiffs have alleged only that the defendants' statements were subjectively false. Defendants argue that the alleged omission  that ValueVision was only willing to obtain a specific type of financing, junk bonds, and that ValueVision was only willing to do so in a financial environment in which interest rates were stable  amounts to nothing more than an allegation of "undisclosed motivation, standing alone." To allow this claim to proceed, defendants contend, would authorize litigation focused solely on the psychological state of the defendants.
In this case, however, the distinction between objective and subjective falseness collapses because the subject matter of the alleged statements and omission is the speaker's intentions. Plaintiffs allege that the defendants created a false impression as to their intentions with regard to financing. For instance, defendant Johander is alleged to have stated that ValueVision was "confident" that it could obtain financing. This statement may have been false both because Johander did not subjectively experience such confidence and because objectively, given defendants' alleged intention to pursue only junk bonds, there was no reason for such confidence. Moreover, proof of the falseness plaintiffs allege would not raise the sort of problems envisioned in Virginia Bankshares. The falseness of the alleged statements can indeed be proven through "garden-variety evidence," involving more than the defendants' states of mind. Indeed, the type of evidence that will be essential in this case is precisely that anticipated by the Court in Virginia Bankshares, when it stated:
Reasons for directors' recommendations or statements of belief are, in contrast, characteristically matters of corporate record subject to documentation, to be supported or attacked by historical fact outside a plaintiff's control. Such evidence would include not only corporate minutes and other statements of the directors themselves, but circumstantial evidence bearing on the facts that would reasonably underlie the reasons claimed and the honesty of any statement that those reasons are the basis for a recommendation or other action ...
Id. at 1092-93, 111 S.Ct. at 2758. Because the alleged statements and omissions are not solely subjective, and because proof of the falseness of these statements can be done through "garden-variety evidence," the statements and omissions are sufficiently factual to survive a 12(b)(6) motion.

B. Scienter
A plaintiff bringing a claim under section 10(b) and rule 10b-5 must allege scienter  "a mental state embracing intent to deceive, manipulate, or defraud." Dirks v. SEC, 463 U.S. 646, 663 n. 23, 103 S.Ct. 3255, 3266 n. 23, 77 L.Ed.2d 911 (1983). The Third Circuit, like most circuits, has concluded that the scienter requirement can also be demonstrated by a showing of recklessness.[5] Here, plaintiffs allege scienter as follows: The defendants knew that the only type of financing they planned to pursue was junk bonds, and thus their statements that suggested a strong likelihood of obtaining financing were made either with an intent to mislead investors or were reckless as to investors' impressions of the likelihood that ValueVision would obtain financing.
Defendants challenge the sufficiency of the complaint with regard to scienter. Specifically, defendants argue that the complaint does not satisfy the requirement imposed by rule 9(b) of the Federal Rules of Civil Procedure *446 that allegations of fraud be pled with specificity. Rule 9(b) provides:
In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.
The purpose of this pleading requirement is three-fold: to provide a defendant with fair notice of the plaintiff's claim, to protect a defendant from harm to its goodwill, and to reduce the number of strike suits. See In re Midlantic Corp. Shareholder Litigation, 758 F.Supp. 226, 231 (D.N.J.1990).
Although the second sentence of rule 9(b) provides that state of mind can be averred generally, some courts, most prominently the Second Circuit, require a plaintiff alleging securities fraud to allege specific facts that give rise to a "strong inference" that the defendants possessed the requisite fraudulent intent. See, e.g., Stern v. Leucadia National Corp., 844 F.2d 997, 1004 (2d Cir.1988); In re Marion Merrell Dow, Inc., Securities Litigation II, 1994 WL 396187 (W.D.Mo. July 18, 1994); In re United Telecom. Securities Litigation, 781 F.Supp. 696, 702 (D.Kan.1991). See also Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068 (5th Cir.1994) (requiring that a plaintiff plead specific facts giving rise to an inference of intent). These courts conclude that allowing plaintiffs to plead the scienter requirement merely by asserting that the defendant had the requisite intent would invite strike suits and other groundless complaints. Applying this standard, the Second Circuit has stated, "The requisite `strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Acito v. Imcera Group, 47 F.3d 47, 52 (2d Cir.1995). See also Kas v. Chase Manhattan Bank, Fed.Sec.L.Rep. ¶ 95,381, 1990 WL 113185 (S.D.N.Y. July 30, 1990).
Relying on the Second Circuit's "strong inference" requirement, the defendants argue that the complaint does not give rise to a strong inference of scienter because the circumstances do not provide a motive for defendants to commit fraud and because the plaintiffs do not allege facts suggesting "conscious behavior" on the part of defendants consistent with an intent to defraud. Plaintiffs suggest, on the other hand, that the defendants may have had at least two plausible reasons for intentionally misleading the public into believing that it was likely that they would obtain financing. First, defendants were trying to convince National Media's board to accept the deal; if ValueVision had been more candid about the contingencies attendant on obtaining the necessary financing, National Media might not have agreed to pursue the deal. Second, by giving the impression that financing would not present an obstacle, defendants attempted to ward away other potential bidders for National Media. Although this explanation of defendants' possible motives for committing fraud is perhaps plausible, the explanation amounts to no more than plaintiffs' best guesses. Plaintiffs have not alleged any specific facts from which a "strong inference" of intent can be drawn.
I am not persuaded, however, that the "strong inference" requirement is called for by rule 9(b). The Third Circuit has not spoken to the issue. But other courts have expressed reservations about the Second Circuit's "strong inference" standard. Notably, the Ninth Circuit, in an en banc opinion, has recently rejected the imposition of any requirement that plaintiffs allege facts from which intent to commit fraud can be inferred. See In re GlenFed, Inc. Securities Litigation, 42 F.3d 1541 (9th Cir.1994). The Ninth Circuit concluded that requiring a plaintiff to allege specific facts from which intent can be inferred was squarely at odds with the language of rule 9(b), which clearly declares that a plaintiff need not allege facts from which intent to defraud can be inferred: "Malice, intent, knowledge, and other condition of mind may be averred generally." The Ninth Circuit acknowledged that a "strong inference" requirement may deter groundless litigation; the court nonetheless concluded that it could not, consistent with its judicial role, impose an additional pleading requirement *447 beyond those mandated by the Federal Rules of Civil Procedure. Id. at 1546. I find the Ninth Circuit's reasoning persuasive and reject the defendants' argument that the plaintiffs must allege specific facts from which a strong inference of scienter can be inferred.
Consistent with the Ninth Circuit's position, I nonetheless conclude that the plaintiffs must aver with particularity the "circumstances constituting fraud," as is required by the first sentence of rule 9(b). As the Ninth Circuit stated, "To allege fraud with particularity, a plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." Id. at 1548 (emphasis in original). In most cases, rule 9(b) will mandate that a plaintiff point to particular facts that suggest that the alleged statements were false when made. For instance, if a corporation's offering documents state that it has $100 million in assets, a plaintiff can assert that this statement was false by pointing to facts suggesting that the corporation had fewer assets. In such a case, the accuracy of the challenged statement can be measured against an external fact. In this case, however, the plaintiffs allege that the statements made by the defendants were false because they did not accurately reflect the defendants' intentions and thus did not reflect the true likelihood that ValueVision would obtain financing. The likelihood that ValueVision would obtain financing is not a fact entirely external to ValueVision, but rather involves the state of mind of the defendants. Because rule 9(b) allows a plaintiff to aver state of mind generally, I conclude that the plaintiffs have satisfied their pleading requirement.
This conclusion is supported by a recognized exception to rule 9(b), under which the plaintiff need not allege facts that are "peculiarly within the defendant's knowledge or control." As the Third Circuit has stated:
Courts must be sensitive to the fact that application of Rule 9(b) prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud. Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs. Thus, courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control.
Craftmatic, 890 F.2d at 645 (internal citations omitted). Here, specific information that would prove the defendants' true intentions  e.g., internal corporate memoranda  lies within the defendants' control. The plaintiffs, therefore, need not allege, at this point at any rate, facts regarding such information. I note, however, that in order to survive summary judgment, plaintiffs will be required to produce sufficient facts to support the allegation that defendants intended from the beginning to pursue only junk bond financing.

C. Causation
In order to state a claim under rule 10b-5, plaintiffs must allege that reliance on the defendants' material misrepresentations or omissions caused them injury. Here, the plaintiffs allege "that defendants' misrepresentations and omissions caused the plaintiffs and the Purchaser Class members to acquire National Media shares at prices above that which they would have paid had the defendants fully and properly disclosed all material information." Plaintiffs' Opposition to Defendants' Motion to Dismiss, at 39. This allegation satisfies the requirements for pleading causation in a 10b-5 action.
The Third Circuit has described a plaintiff's burden as to causation as follows:
In order to satisfy the causation element of an action under § 10(b) or Rule 10b-5, plaintiffs who purchase in an open and developed market need not prove direct reliance on a defendant's misrepresentations; rather, they can satisfy their burden of proof simply by showing that the defendant made a material misrepresentation.
In re Phillips Petroleum Securities Litigation, 881 F.2d 1236, 1249 (3d Cir.1989). In section II.A, supra, I concluded that plaintiffs have sufficiently pled that defendants made material misrepresentations and omissions. *448 The "fraud on the market" theory[6] establishes a rebuttable presumption that these material misrepresentations and omissions inflated the value of National Media stock and that plaintiffs purchased National Media stock in reliance on the market's mistaken valuation of National Media. See Peil v. Speiser, 806 F.2d 1154, 1161 (3d Cir.1986) (stating that once a defendant's misrepresentations have been shown, "the court will presume that the misrepresentations occasioned an increase in the stock's value that, in turn, induced the plaintiffs to purchase the stock").
Defendants have not attempted to rebut the presumption established by the "fraud on the market" theory; they do not argue, for instance, that the alleged misrepresentations were not reflected in the price of National Media stock; nor do they attempt to rebut the presumption of reliance by arguing that the plaintiffs understood that the market price was inflated. Instead, defendants argue that plaintiffs have not adequately pled loss causation because "[t]hey do not allege any connection between any alleged misstatements or omissions and the decline in National Media's share price." Defendants' Motion to Dismiss, at 23. This argument misconstrues the nature of the loss plaintiffs allege. Plaintiffs do not claim that they suffered a loss because the price of National Media stock dropped after they purchased the stock. Rather, plaintiffs allege that the perceived value of National Media stock rose before they purchased. The subsequent drop in the price of National Media stock is irrelevant to the loss plaintiffs suffered in purchasing National Media at an inflated price. See Scattergood v. Perelman, 945 F.2d 618, 624 (3d Cir.1991) (finding that the plaintiffs sufficiently pled loss causation by alleging that "the market price paid by the plaintiffs exceeded the value of the stock at the time of purchase based on the true facts"). Cf. K-B Trucking Co. v. Riss International Corp., 763 F.2d 1148, 1159 (10th Cir.1985) ("[I]n a damage action by a purchaser for fraud inducing the purchase, the measure of damage is the difference between the actual value of the property at the time of the sale, and the value it would have had if the representations had been true.")

III. Count II  Violation of Section 14(e) of the 1934 Exchange Act
Section 14(e) of the 1934 Exchange Act provides a cause of action for material misrepresentations and omissions made in connection with a tender offer.[7] This provision "is modeled after SEC rule 10b-5, and is designed to insure that shareholders confronted with a tender offer have adequate and accurate information on which to base the decision whether or not to tender their shares." Panter v. Marshall Field & Co., 646 F.2d 271, 283 (7th Cir.1981). The elements of a section 14(e) claim are the same as a 10b-5 claim, the only difference being that section 14(e) arises in connection with a tender offer, while rule 10b-5 arises in connection with a purchase or sale of a security. See In re Gulf Oil/Cities Serv. Tender Offer Litigation, 725 F.Supp. 712 (S.D.N.Y.1989). In order to state a section 14(e) claim, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with a tender offer; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury. See Hoffman Electric Inc. v. Emerson Elec. Co., 754 F.Supp. 1070 (W.D.Pa.1991).
*449 Whereas the plaintiffs' rule 10b-5 claim is brought by the purported Purchaser Class, their section 14(e) claim is brought by the purported Tenderer Class. The plaintiffs allege that the Tenderer Class tendered their National Media shares to ValueVision in reliance on the defendants' misrepresentations and omissions as to the likelihood that ValueVision would obtain the financing necessary to complete its purchase of National Media. Plaintiffs allege that as a result of this reliance, they were deprived of the "use and enjoyment" of National Media shares. Specifically, plaintiffs claim damages "based on their inability to sell their tendered shares in the declining market that followed defendants['] tender offer and withdraw[al] of the offer." Plaintiffs' Opposition at 49. The plaintiffs thus claim that through the defendants' fraud, they were induced to tender their National Media shares and were therefore prevented from selling their shares on the open market.
This allegation of injury cannot be sustained. The tendering plaintiffs never were prevented from selling their shares on the open market. The tender offer by ValueVision was never completed, and ValueVision was never obligated to purchase the tendered National Media shares. National Media shareholders who tendered their shares in reliance on the tender offer were always free to withdraw the tenders and sell on the open market. SEC rule 14D-7(a) provides that "any person who has deposited securities pursuant to a tender offer has the right to withdraw any such securities during the period such offer, request or invitation remains open." 17 C.F.R. § 240.14d-7(a). The complaint makes clear that the tender offer was open throughout the period in which the purported Tenderer Class tendered their shares. Shareholders who tendered their shares in reliance on the defendants' material misrepresentations nonetheless could have withdrawn their tenders and sold at market rates. The plaintiffs' injury, if any, must be due to their decision not to withdraw their tenders and sell the shares on the open market, rather than their initial decision to tender their shares.
The allegation of injury, however, suffers a more serious flaw. The plaintiffs claim that they were injured because, relying on the defendants' misrepresentations and omissions, they were unable to sell their shares on the open market during the pendency of ValueVision's tender offer. The plaintiffs do not allege that the trading price for National Media stock following the termination of the merger agreement reflected anything other than its true value.[8] Once the deal fell apart, the trading price of National Media stock fell, as the market corrected for its overvaluation of National Media. Thus, the only possible injury that the plaintiffs suffered was their failure to sell National Media shares at a time when, according to the plaintiffs, the market price was inflated due to defendants' misrepresentations and omissions. Plaintiffs cannot claim a right to sell stock at a price inflated by fraud. Such an injury is not cognizable under section 14(e). For this reason, the section 14(e) claim is dismissed.

IV. Count III  Violation of Section 20 of the 1934 Exchange Act
Count III of the plaintiffs' complaint alleges a claim under section 20 of the Exchange Act brought by both purported classes of plaintiffs against Robert L. Johander, ValueVision's CEO and chairman, Mark A. Payne, ValueVision's chief financial officer, Nicholas M. Jaksich, president and chief operating officer of ValueVision, and Allen G. Aaranson, vice-chairman of the board of directors of ValueVision. Section 20 provides a cause of action against any person who controls another person who violates the securities *450 laws.[9] As the parties acknowledge, the plaintiffs' section 20 claim is derivative of their claims under section 10(b) and 14(e). As a result of the dismissal of plaintiffs' section 14(e) claim, their section 20 claim survives only insofar as it alleges an underlying violation of section 10(b) and rule 10b-5.

Conclusion
For all the above reasons, the defendants' motion to dismiss is denied with respect to the claim under section 10(b) and rule 10b-5; granted with respect to the claim under section 14(e); granted with respect to the claim under section 20 insofar as it is derivative of the section 14(e) claim; and denied with respect to the claim under section 20 insofar as it is derivative of the section 10(b) claim. The defendants must therefore file an answer as is provided by rule 12 of the Federal Rules of Civil Procedure. Because of the dismissal of plaintiffs' section 14(e) claim, that portion of the plaintiffs' motion for class certification that addresses the purported Tenderer Class is now moot.

ORDER
Upon consideration of defendants' motion to dismiss (doc. no. 30), it is hereby ORDERED that:
1. The motion is DENIED with respect to Count I of the complaint, the plaintiffs' claim under section 10(b) of the 1934 Exchange Act, 15 U.S.C. § 78j(b), and rule 10b-5(b), 17 C.F.R. § 240.10b-5;
2. The motion is GRANTED with respect to Count II of the complaint, the plaintiffs' claim under section 14(e) of the 1934 Exchange Act, 15 U.S.C. § 78n(e); and
3. The motion is DENIED with respect to Count III, the plaintiffs' claim under section 20 of the 1934 Exchange Act, 15 U.S.C. § 78t, insofar as it depends on Count I of the complaint, and it is GRANTED with respect to Count III insofar as it depends on Count II of the complaint.
NOTES
[1] On June 26, 1995, plaintiffs filed a motion for class certification. This memorandum, however, does not address the class certification motion.
[2] Section 10 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange 
... (b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j(b).
[3] The rule states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality ...
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b-5.
[4] Although this statement does not appear in the complaint, it is appropriate in the context of ruling on this 12(b)(6) motion for this court to consider it because it appears in the offer, which was quoted and discussed at length in the complaint. See In re Donald J. Trump Casino Sec. Lit., 7 F.3d 357, 368 n. 9 (3d Cir.1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (quoting Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir.1993)).
[5] In In re Phillips Petroleum Securities Litigation, 881 F.2d 1236 (3d Cir.1989), the Third Circuit defined recklessness as "an extreme departure from the standards of ordinary care ... which presents a danger of misleading ... that is either known to the defendant or is so obvious that the actor must be aware of it." Id. at 1244 (quoting Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1045 (7th Cir.1977)) (omission in the Third Circuit text).
[6] In Basic v. Levinson, 485 U.S. 224, 241, 108 S.Ct. 978, 988, 99 L.Ed.2d 194 (1988), the Supreme Court adopted this theory, which declares that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchaser of stock even if the purchasers do not directly rely on the misstatements."
[7] Section 14(e) provides:

It shall be unlawful for any person to make any untrue statement of material fact or omit to state any material fact necessary in order to make the statement made, in the light of the circumstances under which they are made, not misleading, or to engage in fraudulent, deceptive or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition or in favor of any such offer, request or invitation.
15 U.S.C. § 78n(e).
[8] The plaintiffs claim that before the announcement of ValueVision's offer, National Media stock traded in the $6 to $7 dollar range, and that on April 24, 1994, the day after the deal between ValueVision and National Media fell apart, National Media stock traded at $5.25. The plaintiffs do not allege, however, that this difference was due to ValueVision's misrepresentations and omissions. Rather, the gist of plaintiffs' complaint is that the price of National Media stock during the period of ValueVision's abortive merger attempt was inflated due to these misrepresentations and omissions.
[9] Section 20 provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
15 U.S.C. § 78t(a).