**P. SCHOENFELD ASSET MANAGEMENT LLC, on behalf of itself and all others similarly situated, Plaintiff,**

v.

**CENDANT CORP., Walter A. Forbes, E. Kirk Shelton, Cosmo Corigliano, Christopher Mc Leod and Ernst & Young, LLP, Defendants.**

**George Semerenko, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**Cendant Corp., Walter A. Forbes, E. Kirk Shelton, Cosmo Corigliano, Christopher Mc Leod and Ernst & Young, LLP, Defendants.**

**Civ. Nos. 98–4734(WHW), 98–5384(WHW).**

United States District Court,
D. New Jersey.

April 30, 1999.

Joseph J. DePalma, Allyn Z. Lite, Goldstein Lite & DePalma, LLC, Newark, NJ, Arthur Abbey, Jill S. Abrams, Nancy Kaboolian, Abbey, Gardy & Squitieri, LLP, New York, N.Y., for plaintiff P. Schoenfeld Asset Management LLC.

Samuel Kadet Skadden, Arps, Slate, Meagher & Flom LLP, Newark, NJ, Carl Greenberg, Michael M. Rosenbaum, Budd Larner Gross, Rosenbaum, Greenberg & Sade, Short Hills, NJ, for defendant Cendant Corp.

Steven S. Radin, Sills Cummis Zuckerman Radin Tischman Epstein & Gross, P.A., Newark, NJ, Dennis J. Block, Cadwalader, Wickersham & Taft, New York, NY, Greg A. Danilow, Weil, Gotshal & Manges LLP, New York, NY, for defendant Walter A. Forbes and Christopher McLeod.

Richard Schaeffer, Bruce Handler, New York, NY, Dornbush Mensch Mandelstam & Schaeffer, for defendant E. Kirk Shelton.

Donald A. Robinson, Robinson, Lapidus & Livelli, Newark, NJ, Gary P. Naftalis, Alan R. Friedman, Kramer Levin Naftalis & Frankel, New York, NY, for defendant Cosmo Corigliano.

Douglas Scott Eakeley, Lowenstein Sandler PC, Roseland, NJ, Dennis P. Orr, Mayer, Brown & Platt, New York, NY, Michelle Odorizzi, Caryn L. Jacobs, Mayer, Brown & Platt, Chicago, IL, for defendant Ernst & Young LLP.

WALLS, District Judge.

All defendants move to dismiss plaintiffs' amended complaints for failure to state a claim upon which relief may be granted and plaintiffs move for leave to amend their complaints if any or all of their claims are dismissed. The complaints charge defendants with violations of sections 10(b), 14(e), and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5. The complaints are dismissed because they fail to state a cause of action under the securities laws. Plaintiffs' motion to amend their complaints is denied.

## FACTS

Plaintiffs are arbitrageurs who purchased shares of American Bankers Insurance Group, Inc. ("ABI") stock between January 27, 1998 and October 13, 1998 after an announcement by Cendant that it would purchase ABI.[1] Earlier, on December 22, 1997, the American International Group, Inc. ("AIG") and ABI had announced their entry into a merger agreement whereby AIG would acquire 100 % of the outstanding stock of ABI for $47 cash per share. Then, on January 27, 1998, Cendant filed a Schedule 14D–1 with the Securities Exchange Commission ("SEC") which included an offer by Season Acquisition Corp., its wholly owned subsidiary, to purchase ABI for a share price of $58 or approximately $2.7 billion. The "offer to purchase" was also sent to ABI shareholders and included information about Cendant's earnings, revenues, and other financial and operational information. Cendant had engaged in a bidding war with AIG, and AIG had also offered to purchase ABI for $58 per share. Finally, on March 23, 1998 Cendant entered into an agreement with ABI to acquire it for $67 per share or

---

1. Cendant was formed on December 17, 1997 before the class period by the merger of HFS Inc. ("HFS") and CUC International, Inc. ("CUC").

approximately $3.1 billion (the "ABI Merger Agreement").

Cendant filed amendments to its 14D–1 Schedule with the SEC on March 23, 1998, May 7, 1998, July 2, 1998, July 27, 1998, September 1, 1998, and October 2, 1998. Plaintiffs contend that the financial statements contained in the original and amended 14D–1 Schedules and the offer to purchase were materially false and misleading. Plaintiffs allege that they purchased ABI stock in reliance on this materially false and misleading information contained in Cendant's offer to purchase, its 14D–1 Schedules, and other documents and press releases related to the tender offer. They maintain that Cendant's false and misleading statements caused the artificial inflation of the price of ABI's shares and that the true value of the securities was substantially lower than the prices they paid. They purchased the stock in the belief that they would receive $58 or $67 per share from Cendant.

On April 15, 1998, after Cendant announced that it had discovered potential accounting irregularities and expected to restate its annual and quarterly earnings for 1997 and possibly earlier periods, ABI shares dropped 11 % from $64–7/8 to $57–3/4. Plaintiffs assert that ABI's stock price fell further after the July 14, 1998 announcement by Cendant that the accounting irregularities would have a larger impact on its financial statements than had been previously anticipated. However, the stock price of ABI "was buoyed by Cendant's repeated public commitment to complete the ABI Merger." (Am.Compl.¶ 60.) On September 29, 1998, Cendant publicly announced that it had lost $217.2 million in 1997 instead of earning $55.5 million as it had reported earlier. The price of ABI's stock dropped to $43 on that day. Two weeks later, on October 13, 1998, Cendant announced that ABI and it had ended their agreement for the acquisition of ABI; ABI's stock price fell to $35–1/2. (Pl.'s Mem. in Supp. of Mot. at 7.)

According to plaintiffs, Cendant reaffirmed its agreement to buy ABI at the $67 share price on April 27, 1998, May 7, 1998, July 27, 1998, August 31, 1998, and October 2, 1998. (Am.Compl.¶¶ 55, 57, 62, 78, 81.) Cendant ultimately extended the tender offer date to November 2, 1998, but terminated the offer on October 13, 1998. In their complaints and opposition brief to defendants motions, plaintiffs do not allege that they ever tendered any shares of ABI to Cendant. However, at oral argument plaintiffs' counsel represented, without any support, that 28 million shares of ABI were tendered before Cendant's tender offer was withdrawn, but Cendant did not purchase any of the tendered shares.

The ABI Merger Agreement contained several mechanisms for the termination of the merger. The Agreement expressly provided that it could be terminated and the proposed merger abandoned by mutual consent of the Boards of Directors of Cendant and ABI. (Agreement at § 8.1.) Such termination would result in no liability on the part of any party or any of its directors, officers, employees, agents, legal and financial advisors or shareholders. (Id. at § 8.5(a)).

None of plaintiffs' complaints mentions the conditions of the termination of the ABI Merger Agreement. Cendant and ABI entered into a Settlement Agreement, which was filed with the SEC, to effect the termination of the ABI Merger Agreement. Cendant and ABI agreed to release each other, including "their respective affiliates, their respective Representatives and stockholders, and their respective successors and assigns" from any claims related to the proposed acquisition of ABI by Cendant. (Settlement Agreement § 4.) Cendant agreed to pay ABI $400 million cash payment as a break-up fee. (Settlement Agreement § 2.) This break-up fee was announced on October 13, 1998. The Court considers the terms of the Settlement Agreement because that agreement was filed with the SEC as an exhibit to Cendant's quarterly report Form 8–K and

Schedule 14D–1 and is a matter of public record.

On October 14, 1998, plaintiffs filed suit in this Court against Cendant and individual defendants. The individual defendants Forbes, McLeod, Shelton, and Corigliano had been officers or directors of Cendant and/or its predecessor, CUC. The additional defendant Ernst & Young LLP ("E & Y") acted as CUC's independent public accountant from 1983 through the formation of Cendant, and afterwards, audited the financial statements of Cendant Membership Services ("CMS"), a wholly owned subsidiary of Cendant, for the year ending December 31, 1997. These financial statements of CMS were consolidated into Cendant's financial statements and included in Cendant's Form 10–K for the 1997 fiscal year, filed with the SEC.[2] Plaintiffs' complaints allege violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5. The class period in the original complaint began March 23, 1998 and ended October 13, 1998. On February 8, 1999, plaintiffs filed an amended complaint which re-set the beginning of the class period to January 27, 1998, added another claim, a violation of section 14(e) of the Williams Act, and another defendant, Ernst & Young, LLP. Plaintiffs claim that all the defendants violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5, that Cendant and the individual defendants also violated § 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(e) (the Williams Act), and that the individual defendants have violated § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t.

## DISCUSSION

### A. Motion to Dismiss Standard

On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6), the court is required to accept as true all allegations in the complaint, and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 (3d Cir.1994). The question is whether the plaintiff can prove any set of facts consistent with his/her allegations that will entitle him/her to relief, not whether that person will ultimately prevail. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). While a court will accept well-pleaded allegations as true for the purposes of the motion, it will not accept legal or unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegation. *See Miree v. DeKalb County, Ga.*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977); *Washington Legal Found. v. Massachusetts Bar Found.*, 993 F.2d 962, 971 (1st Cir.1993); *Violanti v. Emery Worldwide A–CF Co.*, 847 F.Supp. 1251, 1255 (M.D.Pa.1994). Moreover, the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist. See Fed.R.Civ.P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). The Court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. *See Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 259 (3d Cir.1998); see also 5A Charles A. Wright & Arther R. Miller, *Federal Practice & Procedure* § 1357 at 299 (2d ed.1990).

### B. Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5

■ Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),

---

**2.** Section 240.13a–1 of 17 C.F.R. requires publicly held corporations to file an annual report on Form 10–K with the SEC.

prohibits the use of fraudulent schemes or devices in connection with the purchase or sale of securities. Under § 10(b), it is unlawful to "employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention" of any rule promulgated by the SEC designed to protect the investing public. To implement the statute, the SEC enacted Rule 10b–5, violation of which gives rise to a private cause of action. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). That Rule, in turn, deems it unlawful: (1) "To employ any device, scheme, or artifice to defraud," (2) "[t]o make any untrue statement of a material fact" or to omit to state a material fact so that the statements made "in light of the circumstances," are misleading, and (3) "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b–5. The Supreme Court has held that standing to bring a private cause of action under Rule 10b–5 is limited to actual purchasers or sellers of securities. *Blue Chip Stamps,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539.

▌ This tort, although statutory in origin, sounds in the common law of fraud and deceit and retains, in modified form, the common law elements of duty, breach, causation, and damage. *See Huddleston v. Herman & MacLean,* 640 F.2d 534, 547 (5th Cir.1981) (10b–5 claim derived from common law action for deceit), *modified on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). The plaintiff must prove knowledge by the defendant, an intent to defraud, misrepresentation or failure to disclose, materiality of the information and, injurious reliance by the plaintiff. *Thomas v. Duralite Co.,* 524 F.2d 577 (3d Cir.1975); *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402 (3d Cir.), *cert. denied,* 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817

(1976). More precisely, these elements form the following test. To make a 10b–5 claim, a plaintiff must allege that the defendant made (1) a misstatement or an omission (2) of a material fact (3) with scienter (knowledge) (4) in connection with the purchase or sale of a security (5) upon which plaintiff reasonably relied, and (6) that reliance proximately caused injury to the plaintiff. *Kline v. First Western Government Securities, Inc.,* 24 F.3d 480, 487 (3d Cir.), *cert. denied sub nom., Arvey, Hodes, Costello & Burman v. Kline,* 513 U.S. 1032, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994); *In re Phillips Petroleum Secs. Litig.,* 881 F.2d 1236, 1244 (3d Cir.1989)(citing *Angelastro v. Prudential–Bache Securities, Inc.,* 764 F.2d 939, 942–43 (3d Cir.), *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985)).

Defendants McLeod, Forbes, and Shelton argue that plaintiffs have failed to adequately allege that the subject material misstatements were made in connection with the purchase or sale of ABI securities, that they reasonably relied on defendants' conduct, and that their injuries were proximately caused by defendants' conduct. Defendants McLeod and Forbes also argue that they owed no duty to purchasers of ABI securities. Defendant Cendant maintains that plaintiffs have failed to allege that the purported misrepresentations proximately caused them injury. Defendant E & Y insists that plaintiffs have not alleged that the misrepresentations were made in connection with the purchase or sale of ABI securities and that plaintiffs have failed to plead facts giving rise to a strong inference of scienter on the part of E & Y. Finally, both defendants Cendant and E & Y assert that as a matter of law, plaintiffs could not have reasonably relied on any of their statements after April 15, 1998. Defendant Corigliano adopts the arguments of the other defendants generally, and in particular, the arguments that defendants owed no duty to purchasers of ABI securities and the alleged misstate-

ments were not made in connection with the sale or purchase of ABI securities.

### 1. In Connection with the Purchase or Sale of Securities

 According to these individual defendants and E & Y, plaintiffs have failed to state a § 10(b) claim in their complaints because they have not charged that defendants' purported misrepresentations were made in connection with the sale or purchase of ABI securities. Defendants Forbes, McLeod, and Corigliano further assert that they owed no duty to plaintiffs in the purchase or sale of ABI securities.

Defendants argue that because the misrepresentations plaintiffs have alleged do not pertain to the securities plaintiffs purchased or sold, they have failed to state a § 10(b) claim. As support, defendants rely on *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir.1984), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). There, Chemical Bank had extended loans to Frigitemp Corporation and its subsidiary, Elsters, Inc., which loans were partially secured by a pledge of Elsters stock. After Frigitemp and Elsters defaulted on the loans, Chemical Bank brought a § 10(b) and Rule 10b–5 claim against the accounting firm of Arthur Andersen based upon its preparation of allegedly false and misleading financial statements for Frigitemp but not for Elsters. Because the alleged misleading statements were not made in connection with the pledge of Elsters stock, the court found that Chemical Bank had failed to state a claim for relief under § 10(b) and Rule 10b–5.

As the Third Circuit Court of Appeals announced in *Angelastro,* the law in this circuit "is not inconsistent with *Chemical Bank.*" 764 F.2d at 946. *Angelastro* recognized the danger "in construing the 'in connection with' requirement so broadly that virtually any type of misconduct related to a securities transaction even in the most tenuous or tangential way might be claimed to give rise to a federal securities law violation." 764 F.2d at 945. Our circuit has cautioned trial courts to flesh out the proper scope of the "connection" requirement on a case-by-case basis to "avoid the pitfalls of overreaching." *Angelastro,* 764 F.2d at 945 (citing *Ketchum v. Green,* 557 F.2d 1022, 1027 (3d Cir.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977). (1977)). Although the Supreme Court has concluded that § 10(b) must be read broadly to redress injuries which are the result of deceptive practices "touching" the purchase or sale of securities, *Superintendent of Insurance v. Bankers Life and Casualty Co.,* 404 U.S. 6, 12–13, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971),[3] there must be a high degree of proximity of the securities transaction to the claimed fraud. *Ketchum,* 557 F.2d at 1027.

The securities transaction in *Bankers Life* was part of the defendants' fraudulent scheme. Bankers Life & Casualty Co. had agreed to sell all of the stock of the Manhattan Life Insurance Company ("Manhattan") to one of the defendants, Begole, for $5 million. Begole conspired with others and drew a check for the $5 million payment on an account at Irving Trust Co. ("Irving") although he then had no funds on deposit at that bank. Once Begole and his co-conspirators became stockholders and directors of Manhattan, they replaced Manhattan's board of directors with new members and convinced them to sell U.S. Treasury Bonds held by Manhattan for approximately $5 million. That sum was deposited in Begole's account at Irving to cover the check for the stock purchase. Begole and his co-conspirators then engaged in a complex series of transactions to conceal their misappropriation of Man-

---

**3.** Some commentators have noted that Justice Douglas's use of the term "touching" was nothing "more than his variation of 'in connection with' as a matter of literary style."

*Chemical Bank,* 726 F.2d at 942 (quoting Professor Loss, Fundamentals of Securities Regulation 903–904 (1983)).

hattan's funds. Thus, it is obvious that the defendants undertook the bond transaction in order to misappropriate the proceeds and acquire Manhattan's stock without any cost. In its analysis of *Bankers Life*, our circuit noted that the bond transaction itself was only one step away from the misappropriation. *Ketchum*, 557 F.2d at 1028.

By its *Ketchum* decision, the Third Circuit has concluded that where the claimed fraud is several steps away from the securities transaction, the relationship between the two is too attenuated to satisfy the "connection" requirement of § 10(b). 557 F.2d at 1027–1028. Defendant directors and officers of Babb, Inc. conspired to remove from office the *Ketchum* plaintiffs, who were two officers and employees of Babb as well as shareholders. This conspiracy included an alleged misrepresentation about the re-election of officers and directors. Once plaintiffs were removed from office, the board terminated them as employees as well. Pursuant to a stock retirement agreement which had been established many years earlier, plaintiffs were required to tender their shares to the corporation. Plaintiffs brought an action under § 10(b) and Rule 10b–5 against defendants on the theory that they were forced to tender their shares as a result of defendants' fraudulent scheme. The Court of Appeals found that the degree of proximity between the securities transaction, the forced stock sale, and the claimed fraud was too attenuated to satisfy the "connection" requirement of § 10(b). 557 F.2d at 1027–1028. Significantly, the court found that there were a "substantial number of intermediate steps between the fraud and the accomplishment of the forced sale of plaintiffs' shares: the shareholders' vote subsequent to the misrepresentation; the ensuing meeting of the company directorate during which the plaintiffs were removed as officers; and the adoption of the resolution terminating the plaintiffs' status as company employees." 557 F.2d at 1028. These intermediate steps rendered the re-

lationship between the fraud and the securities transaction too tenuous, too weak, to satisfy the "connection" requirement of § 10(b).

Similarly, the alleged misrepresentations here are many steps removed from plaintiffs' purchase of ABI securities. Plaintiffs allege that Cendant's false and misleading statements of its financial condition and intent to purchase ABI caused the artificial inflation of the price of ABI's shares and that the true value of the securities was substantially lower than the prices plaintiffs paid. The plethora of intermediate steps between Cendant's misrepresentations about its financial condition and plaintiffs' purchase of supposedly inflated ABI securities includes: the effect of AIG's offer to purchase ABI on the price of ABI stock; the ABI Board's decision to enter into a merger agreement with Cendant and end its merger agreement with AIG; the effect of the merger announcement on the price of ABI shares; the conditional nature of the merger agreement, that the agreement was terminable by the mutual consent of the parties with no resulting liability to either party or shareholders; the effect of Cendants' April and July announcements of accounting irregularities in its financial reports of earlier years; Cendant's affirmations of its intent to buy ABI; and the mutual termination of the merger by Cendant and ABI. The degree of proximity between the securities transaction and the claimed fraud, here, as in *Ketchum*, is too attenuated to meet the "connection" requirement of § 10(b). Cendant's alleged misrepresentations are too far removed from plaintiffs' purchase of ABI stock to support a cause of action under § 10(b).

A district court in our circuit has found that an alleged misrepresentation made by a tender offeror in conjunction with its tender offer was made in connection with a purchase or sale of securities. *In re Phillips Petroleum Securities Litig.*, 697 F.Supp. 1344 (D.Del.1988), *vacated on oth-*

*er grounds,* 881 F.2d 1236 (3d Cir.1989). On December 4, 1984, the Mesa Partnership ("Mesa") announced that it had acquired 5.7 % of the outstanding stock of Phillips Petroleum Company ("Phillips") and that it would commence a tender offer for 15 million shares of Phillips common stock at $60 per share. At the same time, Mesa announced that it would not sell any Phillips shares back to Phillips except on an equal basis with all other Phillips shareholders. On December 5, 1984, Mesa filed a Schedule 13–D with the SEC which represented that the proposed tender offer was designed ultimately to obtain control of Phillips and iterated that MESA would not sell its shares back to Phillips except on an equal basis with other shareholders. After a series of negotiations with Phillips, Mesa withdrew the tender offer and sold its shares of Phillips stock to Phillips for $53 per share in cash even though Phillips did not offer to buy the stock of other shareholders at the same rate. Purchasers of Phillips stock during the period between December 5, 1984 and December 21, 1984, the day Mesa entered into negotiations for the buyback agreement with Phillips, sued Phillips and Mesa for violations of § 10(b) and Rule 10b–5, RICO, and various state laws. The district court found that Mesa's alleged misrepresentation in the tender offer that it would not sell its shares back to Phillips except on·an equal basis with other shareholders, was made in connection with the purchase or sale of securities because it related to the purchase of securities by the class of Phillips shareholders and the pursuit of Phillips by Mesa. 697 F.Supp. at 1351 n. 10. The district court's grant of summary judgment to Mesa was vacated on other grounds. 881 F.2d 1236. The Third Circuit did not discuss the connection issue.

Our situation is unlike that in *Phillips* because there the alleged misrepresentation related directly to Mesa's sale of securities to Phillips and proposed acquisition of shares from other shareholders. As stated, the alleged misrepresentations here relate to Cendant's financial condition and not a sale back of stock. The degree of proximity between the misrepresentation and the purchase and sale of securities in *Phillips* was high whereas here it is too dissipated to satisfy the connection requirement.

### 2. Reasonable Reliance

■ All defendants argue that plaintiffs have failed to state a § 10(b) claim because they have not adequately alleged that they purchased ABI stock in reasonable reliance on defendants' conduct. Defendants contend that plaintiffs could not rely on any statement that the proposed merger would be completed because everyone in the securities market, including plaintiffs, was on notice that the proposed merger and tender offer were conditional. The merger agreement was subject to a number of conditions, particularly, that the transaction could have been renegotiated or terminated at any time by mutual consent of the boards of both companies. Thus, plaintiffs could not reasonably rely on Cendant's offer to purchase ABI stock at $67 per share.

According to defendants, Cendant's statements about its intent to buy ABI and complete the merger agreement were nonactionable forward-looking statements. Defendants maintain that these statements of intent must be viewed in light of the market's knowledge that the merger could be canceled at any time by the simple agreement of the parties.

Defendants also charge that at least until March 23, 1998, plaintiffs would have purchased or held ABI stock because they believed they would receive a price of $58 even if Cendant had not offered to buy ABI or misrepresented its financial condition. Until March 23, 1998, both AIG and Cendant had offered to buy ABI at $58 per share. Plaintiffs argue that they purchased shares of ABI stock between January 27, 1998 and March 23, 1998 because they believed they would receive $58 per share and relied on the purported strength

of Cendant's financial condition. The Court finds such argument to be legally deficient. That AIG had made an offer identical to Cendant's to buy ABI precludes the theory that Cendant's statements artificially inflated the price of ABI stock. Because plaintiffs could have purchased ABI stock with an expectation to receive $58, regardless of Cendant's offer and alleged misrepresentation, they cannot establish reliance.

■ Finally, plaintiffs could not have reasonably relied on Cendant's misrepresentations after April 15, 1998, because in its press release that day, Cendant specifically cautioned the public that its previously issued financial statements and auditors' reports should not be relied upon. Cendant announced that it would restate its financial statements for 1997 and possibly for other periods and that it would undertake an investigation into the accounting irregularities. Cendant warned that certain matters in the press release were forward-looking statements subject to a number of risks and uncertainties, including the investigation. Defendants insist that as a matter of law, there could be no reasonable reliance upon the April 15 announcement or on Cendant's earlier financial statements; that the statements in that press release cannot be the basis for a claim because of the "bespeaks caution" doctrine; and the statements in that press release are protected by the safe harbor provisions for forward looking statements in the Private Securities Litigation Reform Act ("PSLRA").

As a matter of law, plaintiffs could not have reasonably relied on defendants' alleged misrepresentations. Defendants' statements about the ABI merger and in the April 15 press release were forward-looking statements protected by the safe harbor provisions of the PSLRA and bespoke caution. For the period between January 27 and March 23, 1998, plaintiffs could not have relied upon Cendant's representations for their belief that they would receive $58 per ABI share because

AIG also offered the same price for ABI stock.

Under the PSLRA, a forward-looking statement may be, among other things,

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer. . . .

15 U.S.C. § 78u–5(i). Once a statement is identified as a forward-looking statement, it is not actionable if it "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A).

Defendants' statements about the merger were forward-looking statements because they were plans for future operations. The statements in the April 15 press release were forward-looking because they focused on the estimated amount of restated earnings which ultimately depended on the investigation by the audit committee. Both the statements about the merger and those in the April 15 press release were accompanied by meaningful cautionary statements. With regard to the merger, the merger agreement was subject to several conditions and terminable at any time upon the simple agreement of the parties. In the case of the press release, the estimated amount of restated earnings was accompanied by a declaration that the restatement was subject to a number of uncertainties including the outcome of the audit committee's investigation. These statements qualify for safe harbor treatment under the PSLRA.

The statements about the merger and those about the accounting irregularities also bespoke caution. The doctrine applies

when language in an offering document negates the materiality of an alleged misrepresentation. The bespeaks caution doctrine is "shorthand for the well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law." *In re Donald J. Trump Casino Securities Litigation*, 7 F.3d 357, 364 (3d Cir.), *cert. denied sub nom. Gollomp v. Trump*, 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). "In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law." 7 F.3d at 371. The cautionary language here, in the merger agreement, was sufficient because it explicitly warned that the merger might not be completed for any number of reasons, including the mutual agreement of the parties. The cautionary language in the April 15 press release was sufficient because it explicitly advised the public not to rely on any previous financial statements and that the full extent of the income and earnings restatements would depend on the outcome of the audit committee's investigation. Because of this cautionary language, plaintiffs could not reasonably rely upon any of these statements.

Plaintiffs' reliance on a "fraud on the market" theory does not satisfy the reliance and causation requirements of § 10(b). The Third Circuit has described the theory:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Peil v. Speiser*, 806 F.2d 1154, 1160–1161 (3d Cir.1986). Allegations of fraud on the market simply afford to plaintiffs a rebuttable presumption of reliance and causation so that each purchaser or seller need not individually prove these elements. *Basic Inc. v. Levinson*, 485 U.S. 224, 241–249, 108 S.Ct. 978, 992, 99 L.Ed.2d 194 (1988). To invoke the presumption, a plaintiff must allege "(1) that the defendant made public misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market; (4) that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the shares; and (5) that the plaintiff traded the shares between the time the misrepresentations were made and the time the truth was revealed." *Basic*, 485 U.S. at 248, 108 S.Ct. at 992 (citing *Levinson v. Basic Inc.*, 786 F.2d 741, 750 (6th Cir.1986)). "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248, 108 S.Ct. at 992. Assuming that plaintiffs have met the pleading requirements necessary to invoke the presumptions of the fraud on the market theory, the presumption of reliance has been rebutted.

### 3. Proximate Cause

Defendants Cendant, Forbes, McLeod, Shelton, and Corrigliano contend that plaintiffs have failed to state a § 10(b) claim because they have not alleged that the conduct by the defendants proximately caused their losses. Plaintiffs allege that Cendant's misstatements about its financial condition caused Cendant to terminate the merger agreement with ABI and therefore caused their losses when Cendant failed to buy their ABI stock. Plaintiffs' theory of causation is that they purchased or held ABI stock in reliance on Cendant's misleading financial statements attached to the January and March 14D–1 filings, that defendants caused the overval-

uation of ABI stock, that the revelation of Cendant's fraud caused the ABI stock price to drop, and they suffered damages because they had purchased ABI stock at inflated prices and the price then dropped. The loss plaintiffs suffered was due initially to the drop in ABI's stock price and later to Cendant's failure to complete the merger and buy their ABI stock at $67. Plaintiffs claim that had they known Cendant's true financial condition, they would not have purchased or held ABI stock.

■ Under the PSLRA, 15 U.S.C. 78u–4(b)(4), the plaintiff in a securities fraud action has "the burden of proving that the act or omission of the defendant alleged to violate [the securities laws] caused the loss for which the plaintiff seeks to recover damages." In order to state a § 10(b) claim, plaintiffs must allege both transaction causation and loss causation. *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *see VT Investors v. R & D Funding Corp.*, 733 F.Supp. 823, 830 (D.N.J. 1990). To satisfy the transaction causation requirement, plaintiffs must establish that they would not have purchased or held ABI stock but for the defendants' misrepresentations. *Schlick*, 507 F.2d at 380. For loss causation, plaintiffs must allege that defendants' misrepresentations directly or proximately caused the economic losses incurred. *Schlick*, 507 F.2d at 380. Although the causation and connection requirements of § 10(b) are not the same, they are "closely intertwined." *Ketchum*, 557 F.2d at 1029 (citing *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187 (3d Cir. 1976)). They both "speak to the degree of proximity required between a misrepresentation and a securities transaction." *Ketchum*, 557 F.2d at 1029.

■ Defendants argue that during the period between January 27 and March 23, 1998, Cendant's misrepresentations could not have caused the "artificial inflation" of ABI stock because AIG also set the value of ABI stock at $58. AIG independently determined the market price for ABI stock with its $58 offer based on its own evaluation of, and interest in, ABI, not the financial condition of Cendant. Defendants contend that the AIG offer constitutes an intervening cause of any purported harm suffered by plaintiffs as a result of their purchases of ABI stock at inflated prices. The Court takes the point of defendants. This intervening cause "serves to disrupt the connection between the challenged conduct on the part of the defendants" and plaintiffs' purchase or retention of ABI stock. *Ketchum*, 557 F.2d at 1029.

■ Defendants assert that their alleged misrepresentations were also not the cause of plaintiffs' losses due to the "artificial inflation" of ABI's stock price after March 23, 1998. Rather, the approval by the ABI Board of the merger agreement with Cendant constituted an independent, intervening cause for those losses. Defendants declare that the price of ABI shares reached a closing price as high as $64–7/16 on March 23, 1998 upon the approval of the ABI Board of the merger agreement with Cendant, not upon any statement or bid by Cendant.

Defendants also argue that the value of ABI shares depends on ABI's own financial statements, not those of Cendant. Defendants insist that Cendant's misstatements could not have caused plaintiffs' loss, because no matter how much Cendant's financial statements were misstated, if the tender offer and merger had been completed, the ABI shareholders would have received $67 a share. Had the tender offer and merger been consummated, plaintiffs would not have suffered any damages. The accounting irregularities could not have had any effect on the value of Cendant shares ABI shareholders would have received in the merger because they would have received whatever number of Cendant shares was necessary to reach $67 in value. Plaintiffs allege that they bought or held ABI stock because they believed that they would receiver $58 or

$67 per share. Because plaintiffs would have received $67 a share if the merger had taken place regardless of Cendant's accounting irregularities, there is no causal connection between defendants' financial misrepresentations and plaintiffs' losses from the fluctuation in ABI's stock price. So are the arguments of defendants.

The Court finds merit in defendants' arguments. Plaintiffs have not adequately alleged that defendants' misrepresentations caused the losses they incurred through, first the inflation of, then the decline in, ABI stock prices. There were several independent causes of plaintiffs' losses, but there is no causal connection between defendants financial misrepresentations and plaintiffs' losses. The "artificial inflation" of ABI's stock price was not caused by Cendant's misrepresentations. As said, before March 23, 1998, AIG had offered the identical price for ABI's stock as had Cendant. The price of ABI stock had reached its apex when ABI announced that it would forgo AIG's merger agreement for one with Cendant. Both the AIG offer and the announcement by the ABI board were independent causes of the inflation of ABI's stock. Moreover, plaintiffs' losses due to the decline in the price of ABI stock were not realized until ABI and Cendant announced, as they had every right to do, that the merger agreement had been terminated and that Cendant would not buy their ABI stock at $67. The termination of the merger, by the mutual consent of Cendant and ABI, was the proximate cause of plaintiffs' losses. The merger was abandoned because of the mutual agreement of the parties, not because of Cendant's misrepresentations.

Assuming the plaintiffs have met the pleading requirements necessary to invoke the presumption of causation of the fraud on the market theory, they still cannot satisfy the causation requirement of § 10(b) because the presumption has been rebutted inherently. The causation presumption is rebutted by a showing that the alleged loss was not the result of the alleged fraud. *Basic*, 485 U.S. at 248, 108 S.Ct. 978. Because there is no causal connection between defendants' alleged misrepresentations and plaintiffs' losses, the presumption of causation under the fraud on the market theory does not hold.

Another court has had before it similar litigation where shareholders who acquire stock of a corporation, the target of a tender offer, sue the prospective acquiring corporation for violations of § 10(b) and Rule 10(b)(5) after the offer is withdrawn. *In re ValueVision International Inc. Securities Litig.*, 896 F.Supp. 434 (E.D.Pa. 1995). The district court accepted, apparently without discussion, that the shareholders had standing to bring an action. However, *ValueVision* is easily distinguishable from our circumstances. There, ValueVision made a tender offer to purchase National Media Corporation ("National Media") and was unable to obtain the financing necessary to complete the merger. Plaintiffs were individuals who bought National Media stock during the pendency of the tender offer (the "purchaser class") and those who had tendered their National Media stock pursuant to the tender offer (the "tenderer class"). They alleged that the price of National Media stock was artificially inflated because of the investors' false impression that ValueVision would obtain financing and acquire National Media. Plaintiffs claimed that they relied on ValueVision's misrepresentations in purchasing and tendering National Media stock and that this reliance caused them injury because of the market's allegedly incorrect assessment of the value of National Media stock. The purchaser class asserted that ValueVision violated § 10(b) and Rule 10b–5, and the tenderer class claimed that ValueVision violated § 14(e) of the Securities Exchange Act. The court held that the purchaser class had stated a claim under § 10(b) and Rule 10b–5 but that the tenderer class did not state a § 14(e) claim.

The misrepresentation in *ValueVision* related directly to ValueVision's ability to

obtain financing. In contrast, Cendant's alleged misrepresentations did not concern any aspect of its merger with ABI or ability to finance the project. Moreover, ABI and Cendant mutually agreed to end the proposed merger without any resulting liability to either party or their shareholders. Cendant paid ABI $400 million. By contrast, ValueVision had agreed to pay National Media a $7 million break-up fee if it terminated the merger agreement, but later refused to pay the amount. And, the alleged misrepresentations here, unlike those in *ValueVision,* did not proximately cause plaintiffs' losses or the termination of the merger agreement.

Plaintiffs have failed to state a cause of action under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) because they have not adequately plead connection, reliance, or causation.

## C. Section 14(e) of the Securities Exchange Act of 1934

In 1968, Congress amended the Securities Exchange Act of 1934 by the Williams Act to protect investors who are confronted with a tender offer for their stock. See *Piper v. Chris–Craft Industries, Inc.,* 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977). Section 14(e) of the Williams Act, 15 U.S.C. § 78n(e) makes it:

> unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

The statute itself does not explicitly provide for a private right of action to enforce § 14(e). In *Piper,* the Supreme Court expressly reserved decision on the issue of whether a corporation which is the target of a tender offer or its shareholders have an implied cause of action under § 14(e). 430 U.S. at 42 n. 28, 97 S.Ct. at 949 n. 28. The Court announced, however, that a tender offeror, suing in its capacity as a takeover bidder, does not have standing to sue for damages under § 14(e). 430 U.S. at 38, 42 n. 28, 97 S.Ct. at 947–948, 949 n. 28.

Various circuit courts have permitted a private cause of action under § 14(e) in certain contexts. The First, Second, and Third Circuits have held that a corporation which is the target of a tender offer has standing under § 14(e) to sue the tender offeror for injunctive relief. *Polaroid Corp. v. Disney,* 862 F.2d 987 (3d Cir. 1988); *H.K. Porter Co., Inc. v. Nicholson File Co.,* 482 F.2d 421 (1st Cir.1973); *Gulf & Western Industries, Inc. v. Great Atlantic & Pac. Tea Co., Inc.,* 476 F.2d 687 (2d Cir.1973). The Third and the Fifth Circuits have held that shareholders of a target corporation have a private right of action under § 14(e) to sue the tender offeror corporation. *Polaroid,* 862 F.2d 987 (recognizing a private remedy "to enable injured shareholders to seek damages to compensate for loss stemming from violation of the Act and an injunction against a tender offer violating the Act where the requirements for equitable relief have been met"); *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974) (allowing a shareholder of a corporation which merged with another corporation to bring suit against the two corporations under § 14(e)).

The elements of a § 14(e) claim are virtually identical to those of a § 10(b) claim. *Chris–Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341 (2d Cir. 1973), *cert. denied* 414 U.S. 910, 94 S.Ct. 232, 38 L.Ed.2d 148 (1973). The difference between them is that the material

misstatements in a § 14(e) claim must be made "in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation," while a § 10(b) claim requires a connection with a purchase or sale of securities. 15 U.S.C. § 78n(e).

### 1. Reliance

Defendants have argued that plaintiffs fail to state a § 14(e) claim because they have not adequately alleged reliance. Defendants maintain that plaintiffs have no claim under § 14(e) as a matter of law because Cendant's tender offer was never completed. To state a § 14(e) claim, plaintiffs must allege that they relied on defendants' misrepresentations in making their decision to tender or not to tender their shares. Because there is no allegation that plaintiffs relied on defendants' misrepresentations to make their decision to tender, plaintiffs have failed to state a § 14(e) claim.

Shareholders of a target corporation who claim reliance and injury outside their decisions to tender cannot state a claim under § 14(e). As the Third Circuit has recognized, § 14(e) "was not intended to create a federal cause of action for all harms suffered because of the proffering or the withdrawal of tender offers. Rather, § 14(e) was enacted principally as a disclosure statute, designed to insure that fully-informed investors could intelligently decide how to respond to a tender offer." *Schreiber v. Burlington Northern, Inc.,* 731 F.2d 163, 165–166 (3d Cir.1984), *affd.* 472 U.S. 1, 4–5, 105 S.Ct. 2458, 2460–2461, 86 L.Ed.2d 1 (1985). Where, as here, the tender offer was not completed, plaintiffs have not alleged that the misrepresentations affected their decision to tender, they have not claimed reliance, plaintiffs have failed to state a cause of action under § 14(e). *See, e.g., Panter v. Marshall Field & Co.,* 646 F.2d 271 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981) (where a tender offer was withdrawn before plaintiffs had the opportunity to decide whether to tender their shares, it was impossible for plaintiffs to rely on any alleged deception in making their decision to tender); *Lewis v. McGraw,* 619 F.2d 192, 195 (2d Cir.), *cert. denied,* 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980) (where no tender offer was consummated, no reliance was possible under any imaginable set of facts). Although both *Panter* and *Lewis* involved tender offers which were withdrawn before they became effective, the Court finds that their reasoning applies to these circumstances, where the tender offer was withdrawn before its expiration and before the acquiring corporation purchased any shares.

Even *ValueVision* found that those plaintiffs who had tendered their National Media shares did not state a § 14(e) claim because the tender offer was never completed. 896 F.Supp. at 439. There, as here, the acquiring corporation was never obligated to purchase the tendered shares, and the shareholders of the target corporation were always free to withdraw the tenders before the expiration of the tender offer. 896 F.Supp. at 439 (citing 17 C.F.R. § 240.14d–7(a)). Although plaintiffs alleged at oral argument that they tendered shares before the offer was withdrawn, those tenders were not successful or definitive. Plaintiffs could have withdrawn the tenders at any time before the expiration of the tender offer pursuant to SEC rule 14D–7(a), 17 C.F.R. § 240.14d–7(a), and Cendant did not purchase, nor was it obligated to purchase, any of those tendered shares.

Most importantly, plaintiffs' claim is that they were induced to purchase or hold shares of ABI stock in reliance on alleged misrepresentations found in the tender offer, not that they were induced to tender or not tender their shares in reliance on those misrepresentations. Plaintiffs have not claimed that they relied on supposed misrepresentations to decide to tender or not to tender their shares. Plaintiffs have

failed to state a claim for relief under § 14(e) because they have failed to allege reliance.

### 2. Causation

■ Plaintiffs have also failed to plead that defendants' misrepresentations caused their injuries. Even if plaintiffs had charged that they relied on defendants' misrepresentations to make their decision to tender their shares and were damaged when Cendant did not purchase their tendered shares, they could not claim that those misrepresentations caused their injuries: The termination of the merger agreement and tender offer, by the mutual consent of the Cendant and ABI boards, caused their injuries. Plaintiffs' § 14(e) claim fails because plaintiffs have not adequately plead reliance or causation.

### D. Section 20(a) of the Securities Exchange Act of 1934

■ Section 20(a) creates liability for "controlling persons" in a corporation, 15 U.S.C. § 78t(a), and imposes joint and several liability upon anyone who "controls a person liable under any provision of" the Securities Exchange Act of 1934. To maintain a claim, the plaintiffs must establish (1) an underlying violation by a controlled person or entity, (2) that the defendants are controlling persons, and that they were "in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880, 885 (3d Cir.1975) (citation omitted).

■ Plaintiffs charge that defendants Forbes, Shelton, Corigliano, and McLeod were controlling persons of Cendant. Plaintiffs contend that each defendant, by virtue of his position as an executive officer or director of CUC and Cendant, exercised his power and influence to cause Cendant and the other individual defendants to violate §§ 10(b) and 14(e) of the Securities Exchange Act of 1934 and Rule 10b–5. Plaintiffs cannot maintain an action against the individual defendants under § 20(a), because they have failed to establish an underlying violation of the securities laws by Cendant.

### E. Plaintiffs' Motion for Leave to Amend

■ Plaintiffs have requested leave to amend their complaints if any or all of their claims are dismissed. However, plaintiffs have not detailed the substance of any amendment or presented to the Court a proposed amended complaint. Although plaintiffs no longer have the right to amend their complaints as a matter of course after those complaints have been dismissed, the Court may still permit amendment as a matter of discretion. *Kauffman v. Moss,* 420 F.2d 1270, 1276 (3d Cir.), *cert. denied,* 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970). However, the Court will not consider plaintiffs' requests until they submit the sought amendment for the Court's review. The present complaints lack legal vitality. Without scrutiny of the proposed amendment, the Court cannot determine whether it, the amendment, would be resuscitable or futile. Plaintiffs' motion for leave to amend is denied.

### CONCLUSION

Because plaintiffs have failed to state a cause of action under §§ 10(b), 14(e), and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5, the motions to dismiss by all defendants are granted. Plaintiffs' motion for leave to amend their complaints is denied.

SO ORDERED:

This matter comes before the Court on the motion of all defendants to dismiss plaintiffs' amended complaints for failure to state a claim upon which relief may be granted, and upon plaintiffs' motion for leave to amend their complaints if any of their claims are dismissed. Upon consideration of the submissions of the parties, oral argument, and for the reasons stated in the accompanying opinion,

ORDERED that the motions of all defendants to dismiss plaintiffs' complaints are granted; and

ORDERED that plaintiffs' motion for leave to amend their complaints is denied.